IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CURTIS W. GREEN and DEBORAH J. GREEN,

                    Plaintiffs,

v.

SPECIALIZED LOAN SERVICING, LLC,

                    Defendant.

OPINION & ORDER

15-cv-513-jdp

---

      Plaintiffs Curtis W. Green and Deborah J. Green bring this action under the Fair Debt Collection Practices Act (FDCPA). The Greens allege that defendant Specialized Loan Servicing, LLC (SLS) attempted to collect a debt that had in fact been discharged in bankruptcy. The Greens contend that SLS's communications about this loan violated the FDCPA and delayed Curtis Green's efforts to obtaining a new loan, which caused the Greens emotional distress.

      The case has been aggressively litigated on both sides, and multiple motions are now before the court. But only one matters. The court will grant SLS's motion for summary judgment on the ground that SLS made none of the challenged communications "in connection with the collection of any debt," which is a required threshold showing under the FDCPA. The court's decision to grant summary judgment renders the other motions moot and disposes of the case.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

The Greens obtained a home loan in 2004. In 2009, they filed for bankruptcy and their debt was discharged. The lender foreclosed on the house and waived any right to a deficiency judgment against the Greens, leaving the Greens free of any obligation on their debt. The right to service their debt was eventually transferred in December 2014 to SLS, a loan servicing company that is a debt collector but also performs various administrative tasks, such as providing tax information and answering questions about the statuses of the transferred loans. SLS then sent four sets of communications that are the basis for the Greens' FDCPA claims.

**A. The Notice**

On December 22, 2014, SLS sent the Greens a letter titled "Notice of Servicing Transfer" (the Notice). Dkt. 74-1. The Notice identified SLS as the new servicer of the Greens' debt and stated that the Greens should send any payment "due on or after 12/16/2014" directly to SLS at its listed address. *Id.* The Notice also included this boilerplate language in bold capital letters:

> If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof.

*Id.*, at 2.

**B. The Credit Report**

In February 2015, Curtis Green applied for a loan to buy a new home. He submitted his loan application to WESTconsin Credit Union, which in turn ordered a credit report on

Curtis Green from a credit reporting agency, CBCInnovis, Inc. The first credit report from CBCInnovis did not contain a tradeline from SLS.[1] On May 28, 2015, WESTconsin ordered another credit report (the Credit Report) for Curtis Green, and this time, the report did include a tradeline from SLS. The tradeline noted—in a format that one in the credit business could understand—a past-due amount and a recent late payment notation:

| 2 | SPECIALIZED LOAN SERVI Redacted 8742 LUCENT BLVD STE 300 HIGHLANDS RANCH CO 80129 (720) 241-7200 | 03/15 | | 07/04 | 66997 | | | 360 M | MTG 06 REAL ESTATE XPN 01 (EFX,TRU) | 24 | 0 | 0 | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | CONVENTIONAL REAL ESTATE LOAN | | | | | | 6XXXXXXXXXXX XXXXXXXXXXXX 03/15 6 | | | |

Dkt. 54-1, at 3, 5. The "6" that preceded the series of "Xs" in the far right column indicated that Curtis Green was at least 180 days past due on his debt. Dkt. 49, at 5. The parties agree that the SLS tradeline should have indicated that the loan had been discharged in bankruptcy.

That same day, Curtis Green and CBCInnovis called SLS multiple times to ask questions about the SLS tradeline. Four days later, CBCInnovis sent SLS a fax titled, "request for information," Dkt. 74-2, at 2, which asked SLS to verify the status of Curtis Greens' loan that appeared on the tradeline.

---

[1] The term "tradeline" refers to:

> [A] segment of a credit report reflecting a credit relationship between the consumer and a creditor. Tradeline information includes customer account numbers, telephone numbers, social security numbers, open dates, credit grantors' names, types of loans, credit limits, payment history, and dates the accounts are closed. Each consumer's file includes all tradelines for that consumer.

*In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 333 (N.D. Ill. 2002).

**C. The Verification Fax**

On June 2, 2015, SLS sent a fax titled "verification of mortgage" (the Verification Fax). Dkt. 74-3. The parties dispute to whom SLS sent the fax and why. According to the Greens, SLS sent it to them as a collection attempt. Dkt. 63, at 13. SLS, on the other hand, states that it sent the Verification Fax to CBCInnovis in response to the request for information. Dkt. 41, at 32. The cover page of the fax indicates that it was addressed to Deborah Green, Dkt. 74-3, at 1, but the fax also lists CBCInnovis as the "requesting company," *id.* at 2.

The header of the Verification Fax stated, "This communication is from a debt collector, this is an attempt to collect a debt and any information obtained will be used for that purpose." Dkt. 74-3. It also included at the bottom a boilerplate language similar to that on the Notice:

> If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy code.

*Id.* The fax also stated that the next payment date was October 1, 2009, that principal balance was $0, and that the Greens were not delinquent over the previous two years. *Id.* But it also stated that the minimum payment was $608.23 and listed 2,069 as "Days Delinquent excluding Grace days." *Id.*

4

**D. The resolution of Curtis Green's loan application**

SLS's tradeline that appeared in the Credit Report caused a delay in Curtis Green's loan application. Dkt. 80, ¶ 19. His loan application was denied at first in May 2015, Dkt. 64, ¶ 11, and this denial caused him to miss the scheduled closing date for his new home in June 2015, Dkt. 80, ¶ 19. But the parties eventually sorted out the issues pertaining to SLS's tradeline, and Curtis Green closed on his house in July 2015. Dkt. 80, ¶ 19.

Both of the Greens contend that they suffered emotional distress as a result of the delay in Curtis Green's loan application (even though they divorced in 2010). According to the Greens, Curtis Green became suicidal and locked himself in his home with firearms, with thoughts of killing himself. Deborah Green, too, suffered emotional distress that manifested in various ways, such as becoming so upset that she yelled and threw things at work. SLS disputes these allegations of extreme distress.

**E. Procedural history**

One month after Curtis Green closed on his home, the Greens filed their first complaint in this case. They amended their complaint, Dkt. 6, and SLS moved to dismiss, Dkt. 9. The Greens amended their complaint again, Dkt. 13, and SLS moved to dismiss the new complaint. Dkt. 19. The Greens moved for sanctions, Dkt. 34, and SLS responded that the Greens' motion for sanction itself was sanctionable, Dkt. 36. In July 2016, the court denied all motions except SLS's motion to dismiss the Greens' claim under § 1692(g). Dkt. 38. The Greens are now proceeding against SLS with their remaining FDCPA claims as alleged in the second amended complaint, Dkt. 13.

In the next few months, the parties filed many motions. SLS moved for summary judgment, Dkt. 40, and in response, the Greens moved to strike the testimony of SLS's

expert witness, Dkt. 45, and two lay witnesses, Dkt. 71 and Dkt. 82. The Greens moved for a partial summary judgment, Dkt. 48, and also moved to amend the briefing schedule, Dkt. 56. SLS then filed a "motion for completeness," requesting the court to take notice of various misrepresentations made by the Greens in one of their briefs. Dkt. 111. The Greens then moved to file a supplemental pleading in December 2016. Dkt. 117. While the parties' motions for summary judgment remained pending, they filed their motions in limine. Dkt. 131 through Dkt. 136 and Dkt. 142.

## ANALYSIS

**A. SLS's motion for summary judgment**

The FDCPA prohibits debt collectors from engaging in abusive, deceptive, or unfair debt-collection practices. 15 U.S.C. § 1692 *et seq*. For the FDCPA apply, two threshold criteria must be met. First, the defendant must qualify as a "debt collector" within the meaning of the term in the FDCPA. 15 U.S.C. § 1692a. That issue is not disputed: SLS is a debt collector. The second threshold criterion is that the communication at issue must have been made "in connection with the collection of any debt." 15 U.S.C. §§ 1692c(a)–(b), 1692e, 1692g. That point is contested here.

The gist of SLS's position is that it never intended to collect anything on the Green's debt; SLS was merely dispatching the other duties of a loan servicer, such as providing the appropriate tax notices, and the credit reporting problem was merely a clerical error. Pressing this general theory, SLS moves for summary judgment on six issues. SLS contends that none of the communications at issue (the Notice, the Credit Report, the Verification Fax, and the Collection Calls) violated the FDCPA. SLS also contends that any violation of the FDCPA

was a bona fide error, which is a defense under the FDCPA. And finally, SLS contends that the Greens have adduced no evidence of emotional distress.

The court will grant summary judgment as to the Notice, the Credit Report, and the Verification Fax on the ground that SLS sent none of these communications in connection with the collection of a debt. The court will also grant summary judgment as to the Collection Calls because this allegation was not pleaded in the governing complaint. Dkt. 13. Because the court is granting summary judgment on the merits for SLS, the court need not reach other issues, SLS's bona fide error defense or whether the Greens have evidence of emotional distress.

The familiar summary judgment standards apply. The court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* The non-moving party may not simply rely on the allegations in its pleadings to create a genuine dispute but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor[.]" *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

### 1. The Notice

The court will grant summary judgment as to the Notice because it was not a communication made "in connection with the collection of any debt."

The question whether a communication was sent "in connection with the collection of any debt" is a question of objective fact, to be determined like any other fact. *Ruth v. Triumph Partnerships*, 577 F.3d 790, 798 (7th Cir. 2009). The question is "objective" in the sense that it is not evaluated from the perspective of an unsophisticated consumer. *Id*. It is also a "commonsense" inquiry, considering principally: (1) the presence or absence of a demand for payment; (2) the purpose and context of the communication; and (3) the nature of the parties' relationship. *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384-86 (7th Cir. 2010). If the communication was sent "specifically to induce the debtor to settle [the] debt," then the communication is an attempt to collect a debt under the FDCPA. *Id.* at 385. The Greens bear the burden of proving that SLS made the communication in connection with the collection of a debt. *Ruth*, 577 F.3d at 798.

The Greens contend that the court resolved this issue conclusively when it denied SLS's motion to dismiss. Not so. On the motion to dismiss, the court could consider only the complaint and the documents incorporated by the complaint, namely the Notice, the Credit Report, and the Verification Fax. At that point, dismissal was inappropriate because the Greens could adduce additional evidence to shed light on whether SLS sent the Notice in connection with a collection attempt. *See, e.g., Enger v. Chicago Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) ("Dismissal is proper if it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to the relief requested." (quoting *R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th

Cir.1989)). The court concluded then the Greens had alleged enough to state a claim. Dkt. 38. But now, on SLS's motion for summary judgment, the Greens have had their chance to adduce additional evidence, but they have none. Accordingly, the court will now consider the relevant factors in light of the Notice itself and the summary judgment record.

The first factor, whether the communication demands payment, weighs strongly in SLS's favor. The Notice does not demand payment from the Greens, and it does not list any amount that the Greens owed or would owe. The Notice also included a bankruptcy disclosure in bold capital letters, which stated that if the Greens had received a bankruptcy discharge of their debt, then the Notice was merely a status update:

> If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof.

Dkt. 74-1, at 2.

The second factor, the purpose and context of the communication, also strongly favors SLS. The Greens do not rebut SLS's explanation of its purpose: SLS had become the servicer of the mortgage and was therefore required to provide notice of the change of servicer under the Real Estate Settlement Procedures Act (RESPA). SLS has also adduced evidence that as the servicer, it attempted to discharge its obligations other than collecting the debt. Dkt. 43, ¶¶ 84-86. The Greens contend that SLS's status as a servicer under RESPA somehow "trigger[ed]" the debt collection requirements of the FDCPA. Dkt. 63, at 3. But the Greens cite no authority to support this notion.

The third factor, the relationship between SLS and the Greens, favors neither side. The parties did not have any relationship before SLS sent the Notice. One common function

of a loan servicer is to collect payments. But that is not the only function of a loan servicer, and it is not a function applicable to debts that have been discharged in bankruptcy. SLS had sent no bills or invoices asking for payment. The relationship between SLS and Greens does not suggest that the communication from SLS was likely an attempt to collect a debt.

The text of the Notice and the context of the relationship between SLS and the Greens allows but one conclusion: the Notice was not sent in connection with an attempt to collect a debt. Because the court will grant summary judgment on that basis, the court need not decide whether the Notice would violate any of the individual provisions of 15 U.S.C. § 1692.

### 2. The Credit Report

There is no dispute that SLS should not have reported information that led to the tradeline on the Credit Report. But that does not mean that SLS reported information about the Greens' discharged loan in connection with an attempt to collect a debt. The record makes clear that SLS was not attempting to collect on the Greens' loan, and the Greens present no evidence relevant to the factors provided in *Gburek*, 614 F.3d at 384. Those factors weigh in favor of SLS. The Credit Report does not demand a payment. The purpose of the Credit Report itself was to respond to a request for a report. The relationship between SLS and the Greens was not that of a debt collector and a mortgagor. There is no genuine dispute as to these facts.

The Greens contend that debt collectors can violate the FDCPA by reporting false information to credit agencies. Dkt. 63, at 21. This is true: reporting negative credit information can be part of an attempt to collect a debt. And debt collectors can use a threat to report information to a credit agency as a means of coercing payment. *See, e.g., Smith v.*

*Encore Capital Grp. Inc.*, 966 F. Supp. 2d 817, 826 (E.D. Wis. 2013). But this is not what happened here, and the Greens have no evidence to show otherwise.

The information in the tradeline was false, or at least misleading, because it showed that the Greens were past due on their home loan. The tradeline itself should not have been on the Greens' report, and the tradeline disrupted Curtis Green's application for a new loan. But the Greens have failed to adduce evidence that the tradeline was connected to some effort by SLS to collect on their discharged debt; merely arguing that debt collectors sometimes engage in such tactics is not enough. Because the Greens have not established the threshold showing that the Credit Report was a collection attempt, SLS is entitled to summary judgment as to the Credit Report.

### 3. The Verification Fax

SLS sent the Verification Fax to CBCInnovis because CBCInnovis requested verification of the tradeline in response to Curtis Green's challenge to the tradeline on the Credit Report. The Verification Fax was not a particularly clear communication about the status of the Greens' loan, but no reasonable jury could find that it was a communication made in connection with an attempt to collect a debt.

Most important, the context of the Verification Fax shows that it was not a collection attempt. Rather, Curtis Green tried to correct his credit report, and CBCInnovis requested that SLS verify the status of his loan. SLS sent the Verification Fax to CBCInnovis in response to CBCInnovis' request for verification.[2] There is no genuine dispute as to these facts.

---

[2] The Greens contend that the Verification Fax was sent to them as well as to CBCInnovis. But they do not have evidence to support this contention. The Greens are correct that their names are on the fax as addressees, but there is no evidence (not even their own declarations)

The Greens contend that the Verification Fax demanded payment because it stated that the minimum payment was $608.23 and that the next payment date was October 1, 2009. But there was more to the Verification Fax that the Greens do not address. The Verification Fax was sent on June 1, 2015, so the fact that the *next* payment date was nearly six years in the *past* makes implausible that this was a demand for payment. And the Verification Fax indicated that the principle balance was zero. Even the unsophisticated consumer can make "basic logical deductions and inferences." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009) (citations omitted). Read as a whole, no reasonable trier of fact could find that the Verification Fax demanded payment.

The Greens also contend that the Verification Fax was an attempt to collect a debt because the Verification Fax included the SLS boilerplate language that it was "an attempt to collect a debt" Dkt. 43-3, at 2. But the boilerplate disclaimer "does not automatically trigger" the FDCPA. *Gburek*, 614 F.3d at 386 n. 3 (citing *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 400 (6th Cir.1998)).

In sum, the Verification Fax is a muddle and not a clear explanation of the status of the Greens' loan. But the lack of clarity in the Verification Fax does not mean that SLS sent it to collect a debt. The context of the Verification Fax makes clear that it was not a collection attempt. SLS is thus entitled to summary judgment as to this communication as well.

---

to suggest that it was ever transmitted to them. SLS submitted evidence that it was transmitted solely to CBCInnovis. Dkt. 78, ¶ 99 and Dkt. 43 ¶¶ 75-78. In any case, the issue is immaterial, because even if the Greens had been copied on the fax, the fax was a response to CBCInnovis' request, not part of an attempt to collect a debt.

### 4. The Collection Calls

SLS also seeks summary judgment on the Greens' allegation that SLS made harassing phone calls to Deborah Green. SLS contends that it did not call the Greens, citing its own call logs. Dkt. 44-23 and Dkt. 44-24. SLS argues that the Greens have no evidence of any call and that Deborah Green's declaration, Dkt. 64, ¶¶ 15, does not provide enough detail to determine who made the alleged calls or whether the calls violated the FDCPA. Deborah Green's declaration is conclusory, but the court will grant summary judgment on this issue for another reason: the Greens did not allege any harassing calls in their second amended complaint, Dkt. 13.

A complaint need not identify the plaintiff's legal theories, but it needs to put the defendant on notice of the plaintiff's claims. As the Seventh Circuit has explained, the complaint "must allege some facts that support whatever theory the plaintiff asserts." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013). And the plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir.2002)).

The second amended complaint makes no mention of any harassing calls, and thus it does not give SLS notice that a claim based on phone calls was being asserted. The Greens first mentioned the alleged calls late in the case (apparently in August 2016, about a week before the summary judgment deadline) in their responses to SLS's discovery requests. Dkt. 44-18 and Dkt. 44-19. An interrogatory response is not a proper vehicle to introduce a new claim. And the Greens' responses were so vague that they did not give much notice of the claim either: "Defendant also made collection phone calls to her at her." Dkt. 44-19. In the

middle of summary judgment briefing, the Greens attempted to flesh out these allegations with a declaration from Deborah Green. Dkt 64.

The bottom line is that the Greens did not plead a claim based on harassing phone calls, and they did not otherwise provide timely notice that they were pursuing such a claim. SLS is entitled to summary judgment on any claim based on the alleged phone calls.

**B. Other pending motions**

The court's decision to grant SLS's motion for summary judgment moots other pending motions.

The Greens move for summary judgment on two issues: (1) whether SLS sent the notices including the information required under § 1692g; and (2) whether SLS knowingly placed false information on the Credit Report. For the reasons explained above, the Greens have not adduced evidence that SLS sent the Notice, the Credit Report, or the Verification Fax in connection with the collection of a debt. Thus, because SLS is entitled to summary judgment on this threshold issue, the court will deny the Greens' summary judgment motion as moot.

Because the Greens have failed to establish the threshold issue, the court need not reach the issue of SLS's bona fide error defense. Accordingly, there is no need for the Greens to respond on that issue and their motion to extend their deadline to respond on that issue, Dkt. 56, at 1, is denied as moot. Likewise, the court will deny the Greens' request for summary judgment on that issue, Dkt. 63, at 24, as moot.

The court will also deny as moot all motions pertaining to the Greens' efforts to strike or exclude SLS's witnesses, Dkt. 45, Dkt. 71, Dkt. 82, because none of the witnesses' testimony was considered in deciding SLS's motion for summary judgment.

Finally, the court will deny all motions in limine, Dkt. 131 through Dkt. 136 and Dkt. 142, because the grant of SLS's motion for summary judgment results in the dismissal of the action.

ORDER

IT IS ORDERED that:

1. Defendant Specialized Loan Servicing, LLC's motion for summary judgment, Dkt. 40, is GRANTED.

2. Plaintiffs Curtis W. Green and Deborah J. Green's motion to strike testimony and report of defendant's expert witness, Dkt. 45, is DENIED.

3. Plaintiffs' motion for partial summary judgment, Dkt. 48, is DENIED.

4. Plaintiffs' motion to amend briefing schedule, Dkt. 56, is DENIED.

5. Plaintiffs' motion to strike the declaration of Michael Ward, Dkt. 71, is DENIED.

6. Plaintiffs' motion to strike the declaration of Frederick Korb, Dkt. 82, is DENIED.

7. Defendant's motion for completeness, Dkt. 111, is DENIED.

8. Plaintiffs' motion for leave to file a supplemental pleading, Dkt. 117, is DENIED.

9. Defendant's motions in limine, Dkt. 131; Dkt. 132; Dkt. 133; Dkt. 134; Dkt. 135; Dkt. 136; are DENIED.

10. Plaintiffs' motion in limine, Dkt. 142, is DENIED.

Entered January 18, 2017.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge